USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/12/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOFIYA BARKAGAN,

Plaintiff,

- against -

UNITED STATES OF AMERICA,

Defendant.

**OPINION AND ORDER**

**08 Civ. 8585 (RLE)**

HONORABLE RONALD L. ELLIS, U.S.M.J.:

## I. INTRODUCTION

Plaintiff Sofia Barkagan brought this action against Defendant United States of America ("the Government") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, alleging that she fell down a flight of stairs in a Manhattan post office as a result of Defendant's negligent maintenance of the floors. The parties consented to jurisdiction before the undersigned pursuant to 28 U.S.C. § 636(c). The Court conducted a trial on the issue of liability on May 17, 2010, and this opinion constitutes the Court's finding of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court finds that Barkagan failed to meet her burden of proof that the Government created a dangerous condition or had actual or constructive notice of a dangerous condition, and failed to correct it. Therefore, Judgment shall be entered for the Government.

## II. BACKGROUND

### A. Barkagan's Evidence

Barkagan testified that on October 25, 2007, she left her house intending to do some shopping and pick up a parcel at Cathedral Station Post Office ("Cathedral Station"), which is located at 215 W. 104th Street, New York, New York. (Tr. at 8.) She brought a small shopping cart with her for groceries. (Tr. at 7.) Barkagan stated that she wore special, flat shoes designed

to limit foot pain caused by diabetes, although she stated that she had no difficulty walking or maintaining her balance. (Tr. at 7-8.) A "very light rain" or "drizzle" was falling outside when she arrived at the post office. (Tr. at 45.) Only a few customers were inside, and she quickly collected her parcel. (Tr. at 12.) As she was leaving, she slipped on a "little piece of carpet or area rug" located at the top of a flight of stairs in front of the exit. (Tr. at 9.) She described the carpet as resembling a faded "old rag" that had no distinctive color. (Tr. at 17.) The rug moved beneath her, she lost her balance, and she rolled down the steps, hitting her head on the marble floor. (Tr. at 9.) Barkagan lost control of her cart as she fell, but she testified that the cart played no role in her fall. (Tr. at 10.) On cross-examination, Barkagan responded affirmatively when asked whether she slipped on the rug because it was soaked in water. (Tr. at 22.) Two women helped Barkagan get up from the floor, and placed her in a nearby chair. (Tr. at 12.) Barkagan testified that someone took pictures of her while she was waiting for an ambulance to arrive. (Tr. at 12.) Barkagan presented no evidence in addition to her testimony.

## B. The Government's Evidence

The Government's first witness was Melody Jenkins, a sales service associate who worked at Cathedral Station on the day Barkagan was injured. (Tr. at 53-54.) Jenkins testified that she went to the lobby of Cathedral Station with a Polaroid camera after she heard that a customer had fallen, and the Court admitted into evidence the photographs Jenkins took of Barkagan and the stairs. (Tr. at 58; Government's Exhibits ("Gvt. Exs.") 7a-7j.) The photographs of Barkagan were taken shortly after she fell, and the photographs of the steps were taken less than fifteen minutes after she was taken to the hospital. (Tr. at 62-63.) The photographs reflect that mats were located at the bottom (Gvt. Ex. 7i) and at the top (Gvt. Ex. 7j; Tr. at 64-66) of the stairs.

The Government's second witness was Michael Branch, a custodian who worked at Cathedral Station on the day Barkagan was injured. (Tr. at 73.) Branch testified that the

custodians typically put mats out at the bottom and the top of the stairs when it rains. (Tr. at 76.) Although he did not personally check to see whether the floor and mats were wet on the day Barkagan was injured, Branch testified that on rainy days custodians are responsible for checking on the conditions of the lobby floor and mats three times an hour, and mopping up any wet spots. (Tr. at 76-77, 90.) During October 2007, Branch stated that two different sized mats were used in Cathedral Station: one was three feet by ten feet and the other was four feet by six feet. (Tr. at 78.) Both mats were made of rubber, and had a zig-zag pattern on the bottom to prevent skidding. (Tr. at 80.) An example of one of the mats used in Cathedral Station during that time period was admitted into evidence. (Gvt. Ex. 10.) Branch also testified that the mats were cleaned and rotated every two weeks (Tr. at 84), and the Government introduced receipts from September 25, 2007, October 9, 2007, and October 23, 2007, that show that clean mats were delivered to Cathedral Station on those dates (Gvt. Exs. 9, 12).

The Government's final witness was Germaine Seabrook, a customer service supervisor, who worked at Cathedral Station on the day Barkagan was injured. (Tr. at 93.) On the day of the incident, Seabrook conducted an investigation of Barkagan's fall, interviewed Barkagan, and completed an accident report. (Tr. at 96.) Seabrook testified that she asked Barkagan about her fall shortly after the accident, and Barkagan told her that "she was pushing her pushcart and tripped." (Tr. at 97.) Seabrook examined the steps, and did not find any problems, such as loose concrete or wet spots, that would have caused Barkagan to fall. (Tr. at 100, 102.) Seabrook's accident report was introduced into evidence, and the report shows that Seabrook noted that no weather factors, such as rain, contributed to Barkagan's accident. (Gvt. Ex. 1.)

Barkagan's medical records from Lenox Hill Hospital and a report from the National Oceanic and Atmospheric Administration were also admitted into evidence. (Tr. at 116.) The medical records were created on the day Barkagan was injured, and contain a written entry that notes that Barkagan stated that she was injured when "she tripped and fell" while leaving the

post office. (Gvt. Ex. 2, at 2.) The National Oceanic and Atmospheric Administration report shows that a total of 1/14 of an inch of rain accumulated in Central Park before noon on October 25, 2007, and that no rain was reported for the rest of the day. (Gvt. Ex. 13.)

### III.  DISCUSSION

Under the FTCA, Barkagan's claim is governed by New York law. *See* 28 U.S.C. § 1346(a). In New York, negligence is defined as conduct which falls "below that of a reasonably prudent person under similar circumstances judged at the time of the conduct at issue." *Holland v. United States*, 918 F. Supp. 87, 89 (S.D.N.Y. 1996) (citing *Paulison v. Suffolk County*, 775 F. Supp. 50, 53 (E.D.N.Y. 1991)). Under New York law, "the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lomard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing cases). With regard to premises liability, New York has adopted a single standard of liability, requiring an owner to maintain reasonably safe conditions in view of all circumstances, "including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk. *Paulison*, 775 F. Supp. at 53. "In order to make out a prima facie case of negligence under New York law, a plaintiff must establish by a preponderance of the evidence that defendant either created the condition which caused the injury or had actual or constructive notice that such a condition existed and failed to cure it in a timely manner." *Rambert v. United States*, 94 Civ. 1275 (JES) (RLE), 1996 WL 583392, *3 (S.D.N.Y. Oct. 10, 1996) (internal citations omitted); *Mentasi v. Eckerd Drugs*, 61 A.D.3d 650 (2d Dep't 2009) ("A defendant may be held liable for an injury proximately caused by a dangerous condition created by water . . . tracked into a building if it either created the hazardous condition, or had actual or constructive notice of the condition and a reasonable time to take remedial action.").

Barkagan's attorney asserts in post-trial briefing that the Government breached its duty to provide reasonably safe facilities to post office customers when it allowed water to accumulate

on the floors and mats of the lobby of Cathedral Station. (Plaintiff's Brief on Issue of Defendant's Liability ("Pl. Br."), p. 3.) Barkagan's attorney argues that the evidence presented at trial supports a finding that she fell down the stairs after slipping on an old, worn out "piece of wet fabric" that was laid out at the top of the stairs. (*Id.* at 1.) The Government argues that Barkagan failed to show by a preponderance of the evidence that the Government had actual or constructive notice of a dangerous condition and failed to correct it. (Defendant's Post-Trial Memorandum of Law ("Def. Mem."), at 1.) The Government asserts that the evidence does not establish that Barkagan slipped on a wet piece of worn fabric or that it had notice of such a condition even if it existed. (*Id.* at 3, 7.) After considering the evidence, the Court finds that Barkagan's attorney's claims and factual assertions are not supported by the record. Barkagan has failed to prove that a dangerous condition existed in the post office at the time of her fall. Moreover, even if there had been a dangerous condition, she has failed to show that Defendant had knowledge of the condition or failed to correct it in a timely manner.

As an initial matter, the Court finds that Barkagan's testimony was not credible. Barkagan's demeanor on the stand indicated that she was being evasive when she answered questions. She had a number of suspicious memory lapses during critical parts of her testimony. For instance, she had difficulty remembering the size and color of the rug she allegedly slipped on, and also had trouble remembering conversations she had with people shortly after the accident. (*See* Tr. 9-10, 17-18, 25-27.) Barkagan's convenient forgetfulness combined with her evasive demeanor on the stand rendered her testimony unconvincing and unbelievable.

Even were the Court to fully credit Barkagan's evidence, it is inadequate to sustain her claim. Despite the vague assertion by counsel that the Government "allowed" water to accumulate, Barkagan presented no evidence that the Government "created" a dangerous condition. In fact, Barkagan's statements from shortly after the accident contradict this assertion since she claimed to have "tripped" not "slipped." Similarly, Barkagan presented no evidence

that the Government had actual notice of the alleged dangerous condition. She is left with the possibility of having to establish that there was constructive notice. This she failed to do. There is, in fact, no credible evidence that a dangerous condition existed.

The evidence admitted at trial does not support the contention in Barkagan's post-trial brief that her "slip on the floor mat resulted from accumulation of water dragged into the building on peoples' shoes, clothes, and umbrellas after many hours of rain." (Plaintiff's Reply Brief on Issue of Defendant's Liability, p. 1.) No evidence presented at trial supports the assertion that customers dragged water inside the post office. The credible evidence supports a contrary finding, that the floor to the post office was dry and well-maintained. In her direct testimony, Barkagan did not even mention water. It was only in response to a question during cross-examination that Barkagan gave any indication that the floor was wet. (Tr. at 22.) This belated assertion, however, simply was not credible. Less than 0.1 inch of rain had fallen on the morning of October 25, 2007, and this light rain had stopped two hours before Barkagan arrived at the post office. (Gvt. Ex. 13) There is no evidence that Barkagan complained to anyone about any slippery conditions on the day of the accident. (*See* Tr. at 21.) When interviewed by Seabrook minutes after the accident, Barkagan claimed that she had "tripped" and fallen down the stairs, not that she had slipped. (*See* Tr. at 97.) Barkagan told the same story to doctors at Lenox Hill Hospital when she was treated for her injuries hours later. (Gvt. Ex. 2, at 2.) Accordingly, the evidence does not establish by a preponderance of the evidence that the floor of the post office was wet.

The evidence also does not support Barkagan's testimony that she slipped on a small, worn piece of fabric or rug. The Government presented credible evidence that a strong, well-kept mat was located at the top of the stairs, and it was neither old nor slippery. Branch testified that it was standard practice for mats to be placed at the top of the stairs on rainy days, and photographs taken of the stairs shortly after the accident show that mats were placed at the top

and bottom of the stairs. (*See* Gvt. Exs. 7h-7j; Tr. at 64-66, 76.) The evidence also shows that the mats were made of rubber, were regularly cleaned, and had a zig-zag tread on the bottom designed to prevent skidding. (*See* Tr. at 80; Gvt. Exs. 9, 10, 12.) The Court finds that the mat placed at the top of the stairs was not a small, worn piece of fabric, but was rather a well-maintained mat designed to prevent skidding.

## IV. CONCLUSION

For the reasons set forth above, Barkagan has failed to show that the existence of a dangerous condition that caused her to slip and fall down the steps in Cathedral Station. Accordingly, Barkagan has failed to show that the Government's negligence caused her injuries.

**IT IS THEREFORE ORDERED** that judgment be entered for the Government.

**Dated: November 12, 2010**
**New York, New York**

*/s/ Ronald L. Ellis*
**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**